# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------

DANIEL FINOCCHIARO, ERIC MITCHELL,              Case No.:  1:15-cv-06385-NRB
RICHARD SELBY, YONG HOE TAN,
DAVID COPELAND, DEAN BERGER, JULIAN              Class Action
BOURDAILLET, CAMILLA HEMPLEMAN,
TERRY HEMPLEMAN, EVAN LITTLE,

     **Plaintiff(s),**

**vs.**                                          **AMENDED**
                                                 **CLASS ACTION COMPLAINT**
                                                 **FOR VIOLATIONS OF THE**
NQ MOBILE, INC., HENRY YU LIN,                   **FEDERAL SECURITIES LAWS**
OMAR SHARIF KHAN,
VINCENT WENYONG SHI, XU ZHOU,
JAMES DING, JUN ZHANG, ROLAND WU,
CHUN DING, WILLIAM TIEWEI LI,
XIUMING TAO, MAX YAO, JUSTIN CHEN,               <u>JURY TRIAL DEMANDED</u>
YING HAN, ZEMIN XU, MATTHEW
MATHISON, BINGSHI ZHANG.

     **Defendant(s).**

-------------------------------------------------------

   DANIEL FINOCCHIARO, ERIC MITCHELL, RICHARD SELBY, YONG HOE TAN,

DAVID COPELAND, DEAN BERGER, JULIAN BOURDAILLET, CAMILLA

HEMPLEMAN, TERRY HEMPLEMAN, EVAN LITTLE (hereinafter "Plaintiffs") bring this

action by and through their attorneys Bridget E. Butler, Esq., Edgar Gentle, Esq. (Pro Hac Vice

pending), Sterling L. DeRamus, Esq., (Pro Hac Vice pending) on behalf of themselves, and

allege the following based on the investigation of counsel, and the specific allegations based on

Plaintiffs' personal knowledge. The investigation of counsel included, but is not limited to, a

review of NQ Mobile Inc's (hereinafter "NQ Mobile" or "Company") public filings with the

United States Securities and Exchange Commission ("SEC"), press releases issued by NQ

Mobile, media news reports on NQ Mobile and other publicly available information, including,

but not limited to, price and trading volume of the Company's American Depository Receipts ("ADRs") and analyst reports. Plaintiffs' personal knowledge includes numerous phone calls with NQ Mobile Investor Relations Department, various face-to-face meetings with NQ management, and email exchanges with NQ Mobile regarding various issues surrounding the allegations in this Complaint.

## NATURE OF THE ACTION

1. This is a federal class action against NQ Mobile, Inc. ("NQ Mobile" or "Company") and certain of its officers, alleging violations of federal securities laws. Plaintiffs brings this action on behalf of themselves, investors who have purchased shares of NQ Mobile between November 1, 2013 and May 15, 2015, inclusive (the "Class Period"), pursuing remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. NQ Mobile is a global provider of mobile Internet services that was formed in 2005. It was listed on the New York Stock Exchange ("NYSE") in 2011, in an $89 million traditional initial public offering underwritten by Piper Jaffrey. The Company raised $69 million more the following year, from a secondary offering, underwritten by Morgan Stanley and Deutsche Bank AG.  NQ's portfolio includes mobile security and mobile games as well as advertising for the consumer market and consulting, mobile platforms mobility services for the enterprise market.  NQ Mobile is a public company, listed on the NYSE as "NQ". NQ Mobile is considered a small-cap stock with a total market capitalization of $479 million. On May 9, 2014, NQ Mobile stock was trading at $11.97 a share. A year later, in May 2014, it was trading at $3.78 per share.

3. On October 24, 2013, shares of NQ Mobile opened at $23 a share and closed at $12.09, after the Muddy Waters Research Group ("MWRG") publicly issued a scathing report on

NQ Mobile, calling the Company a "massive fraud", and marking it as a "strong sell". MWRG accused NQ Mobile of falsifying financial statements, bank accounts, and information like market share and paying user base in China. MWRG accused NQ Mobile of manufacturing its own revenue which really came from a shell company Yidatong, a payment processor, controlled by NQ Mobile. MWRG claimed that "NQs largest customer is really NQ, and that NQ Mobile was fraudulently engaged in continuous round tripping transactions to bolster revenues. Class action litigation is pending in SDNY based largely on the revelations made in this MWRG report, which pertain to events surrounding NQ Mobile's initial public offering.

4.  Entirely separate and apart from the events that lead to the MWRG report and subsequent litigation, on December 23, 2013, at the NQ Mobile annual meeting, two months after the MWRG report was published, NQ Mobile shareholders voted to amend the Company bylaws to allow Management to pledge their NQ Mobile shares for personal loans. The Securities and Exchange Commission ("SEC") does not require insiders of Chinese-based companies that trade on the New York Stock Exchange as an American Depository Receipts (ADRs) to disclose pledges of stock for personal loans. Then in 2014, NQ Mobile abruptly made a number of deliberate and secretive acquisitions that lead, ultimately, to severe dilution of shares and shareholder losses.

5.  Separate and beyond the accusations by MWRG, in October 2013, primarily in 2014 and early 2015, NQ Mobile engaged in deceptive business practices which resulted in the defrauding of NQ Mobile investors, specifically, with regard to a unique pattern of acquiring small, private web-based Chinese companies, particularly in 2014, in the same two-step process, that ultimately leads to drastic dilution of shares. The Company's

acquisition process routinely began with NQ Mobile making an initial minority purchase, of a target company, usually with cash and sometimes some equity as well. Then NQ Mobile would make a majority purchase - always with equity. In the interim period, the target company experienced rapid growth and expansion that appears to be the result of significant funding. Then NQ Mobile pays a premium, always in equity, for a majority holding of the target company. The target companies are given large amounts of NQ Mobile shares to then sell on the open market and repay loans, resulting in NQ Mobile, or Management Defendants, aka, NQ Mobile insiders, being reimbursed for previous investments. So NQ Mobile has an incentive to pay far over fair market value for a target company. In fact, NQ Mobile has consistently done just that, in recent years– overpay in a second majority purchase of a target company, always with equity.

6.  The interim periods between the initial minority purchase and the second majority purchase, the "growth" period, in these acquisitions, involves companies that are technically "third parties" and therefore disclosures of all aspects of these transactions are not required. This secretive acquisition strategy has allowed the Company to expand while temporarily avoiding the negative consequences of a secondary offering, on the open market. The execution of this strategy resulted in drastically diluted shareholder value, unbeknownst to them, and ensured that shareholder value will not rise in the long term.

7.  Specifically, in May 2014, NQ Mobile acquired several small private Chinese companies and failed to disclose these acquisitions until a 20F filing on October 27, 2014, six months later. On May 15, 2014, NQ Mobile acquired another 45% equity interest in, Beijing Showself Technology Co., Ltd. ("Showself"), a Chinese webcam chat site and

mobile application, with largely poor reviews.[1] The cost was $77,000 in cash and 29,950,000 shares for the 45% in May 2014. With the stock trading between $7 and $12 during the month of May 2014, the cost of this additional 45% interest in Showself is estimated to be somewhere between $45 million to $75 million. NQ Mobile paid far over market value for the shares on May 15, 2014, and caused drastic dilution of stock as a direct result of the purchase.

8. Again, in May 2014, NQ Mobile acquired a 70% stake in Yipai Tianxia Network Technology Limited ("Yipai") for $7 million in cash and 33,900,125 shares. This stock was trading between $7 to $12 during the month of May 2014, which means the total cost of this acquisition, for a 70% interest in Yipai was somewhere between $54 million to $89 million. Yipai is a mobile advertising company according to NQ Mobile and their website is expai.com. This company has a few mobile applications available on iTunes with no ratings or reviews, and only 100 to 500 downloads on Google Play. No independent analysis of similar companies would value such an entity, with such a small number of product purchases, anywhere near $54 million. NQ Mobile paid far over market value for the Yipai shares, and caused drastic dilution of stock as a direct result of this acquisition.

9. In sum, NQ Mobile spent around $13 million in cash and 137 million common shares to acquire stakes in several private Chinese companies, in 2014, including, but not limited to, Showself and Yipai. With 1 American Depository Shares ("ADS") being equal to 5 common shares that is equivalent to over 27 million ADS, which were used for acquisitions. NQ Mobile has not explained why the acquisitions were made, in the first

---

[1] Reviews of the Showself mobile application, on www.AppAnnie.com, are relatively poor, with 15 out of 40 referring to Showself as "garage", "junk", "rubbish", in addition to some Chinese language that translates to "con man", "fraud", "cheated" and "liar". www.showself.com

place, and there is no evidence that the costs were justified and in the best interest of NQ Mobile and its shareholders.

10. On July 6, 2014, NQ Mobile announced the resignation of Ying Han; from the NQ Mobile board director position and Chairwoman of Audit Committee. NQ Mobile stock traded heavily in the week leading up to this announcement.

11. On July 18, 2014, NQ Mobile announced the replacement of its auditor PriceWaterhouseCoopers China ("PWC China") with that of Marcum Bernstein Pinchuk LLP, ("MBP") after PWC China would not endorse the SEC 2013 20F filing, the NQ Mobile 2013 annual report, without reviewing documentation related to third-party transactions. Those transactions were so significant, PWC China would not move forward without reviewing them. NQ Mobile never produced such documentation and instead replaced the auditors. The twice delayed filing of its 2013 20F was finally made on October 27, 2014.

12. On July 30, 2014, NQ Mobile publicly announced a non-binding offer from U.S. based Bison Capital Holding Company Limited ("Bison"), to acquire all of NQ Mobile's outstanding ordinary shares and ADS for a fixed cash consideration of $9.80 a share. In the month of August, NQ Mobile stock price ranged in value between $6.44 and $6.91, per share, and the average price from August to June averaged $6.46 per share. Despite shareholder demands, NQ Mobile never accepted this offer, when the stock never traded as high as $9.80.  In fact, between July 31, 2014 and November 1, 2014, NQ Mobile was trading between $5.77 and $9.46, and NQ Mobile CEO Omar Khan and Matthew Mathison, Vice President of Capital Markets, were both telling investors the Company

was worth much more than $9.80 per share, and the Company would not accept this buyout offer. Investors were told the Company is worth "billions".

13.  NQ Mobile announced on December 18, 2014, a Memorandum of Understanding with Tack Fiori International Group Ltd ("Tack Fiori"), a company incorporated in the Cayman Islands with limited liability and listed on the Main Board of The Stock Exchange of Hong Kong Limited ("HK Stock Exchange"), whereas Tack Fiori would purchase 100% equity interest and assume all liabilities of a major NQ Mobile asset, FL Mobile, and NQ Mobile stock would be further diluted.  More than seven months have passed and there has been no purchase, or further word about this alleged transaction, and the stock price has continued to plummet.

14. NQ Mobile received proceeds of a $172,500,000 bond, in 2013, in a year when the Company was already flush with cash, but the company has mostly failed to use the money, causing a direct negative effect on the stock price.

## II.    JURISDICTION AND VENUE

15. The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder and under Sections 11, 12(a) (2) and 15 of the Securities Act. Jurisdiction is conferred by Section 27 of the Exchange Act and Section 22 of the Securities Act.

16. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §139(b). Some of the acts and transactions alleged herein, including the preparation and dissemination and of materially false and misleading information, occurred in substantial part, in this District.

17. In connection with the acts alleged in this Complaint, Defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

18. Plaintiff, Daniel Finocchiaro, purchased common stock of NQ Mobile during the Class Period, on the dates indicated in his affidavit attached hereto (which is hereby incorporated by reference) and has been damaged thereby.

19. Plaintiff, Richard Selby, purchased common stock of NQ Mobile during the Class Period, on the dates indicated in his affidavit attached hereto (which is hereby incorporated by reference) and has been damaged thereby.

20. Plaintiff, David Copeland, purchased common stock of NQ Mobile during the Class Period, on the dates indicated in his affidavit attached hereto (which is hereby incorporated by reference) and has been damaged thereby.

21. Plaintiff, Eric Mitchell, purchased common stock of NQ Mobile during the Class Period, on the dates indicated in his affidavit attached hereto (which is hereby incorporated by reference) and has been damaged thereby.

22. Plaintiff, Yong Hoe Tan, purchased common stock of NQ Mobile during the Class Period, on the dates indicated in his affidavit attached hereto (which is hereby incorporated by reference) and has been damaged thereby.

23. Plaintiff, Dean Berger, purchased common stock of NQ Mobile during the Class Period, on the dates indicated in his affidavit attached hereto (which is hereby incorporated by reference) and has been damaged thereby.

24. Plaintiff, Julian Bourdaillet, purchased common stock of NQ Mobile during the Class Period, on the dates indicated in his affidavit attached hereto (which is hereby incorporated by reference) and has been damaged thereby.

25. Plaintiff, Camille Hempleman, purchased common stock of NQ Mobile during the Class Period, on the dates indicated in his affidavit attached hereto (which is hereby incorporated by reference) and has been damaged thereby.

26. Plaintiff, Terry Hempleman, purchased common stock of NQ Mobile during the Class Period, on the dates indicated in his affidavit attached hereto (which is hereby incorporated by reference) and has been damaged thereby.

27. Plaintiff, Evan Little, purchased common stock of NQ Mobile during the Class Period, on the dates indicated in his affidavit attached hereto (which is hereby incorporated by reference) and has been damaged thereby.

**1.  The NQ Mobile Defendants**

28. NQ Mobile, formerly "Netquin Mobile Inc.," is a company founded in 2005, in Beijing, China with dual headquarters in Beijing, China and Dallas, Texas. NQ Mobile purports to be a non-carrier provider of mobile internet services. NQ Mobile's services and products allegedly include mobile security, mobile games, advertising and consulting for the consumer market, as well as, mobile platforms and mobile services for the enterprise market. NQ Mobile stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "NQ".

29. The following officers and directors of NQ Mobile (the "Management Defendants") are also defendants in this action. They include former and current members of senior management, officers and directors:

A.  HENRY YU LIN,
B.  OMAR SHARIF KHAN,
C.  VINCENT WENYONG SHI,
D.  XU ZHOU,
E.  JAMES DING
F.  JUN ZHANG,
G.  ROLAND WU,
H.  CHUN DING,
I.   WILLIAM TIEWEI LI,
J.   XIUMING TAO,
K.  MAX YAO,
L.  JUSTIN CHEN,
M. ZEMIN XU,
N.  MATTHEW MATHISON,
O.  YING HAN,
P.  BINGSHI ZHANG.

30. During the Class Period, the Management Defendants, as senior executive officers,
    and/or directors of NQ Mobile, were privy to confidential and proprietary information
    concerning NQ Mobile, its operations, finances, financial condition and present and
    future business prospects. The Management Defendants also had access to material
    adverse non-public information, concerning NQ Mobile, as discussed in detail below.
    Because of their positions with NQ Mobile, the Management Defendants had access to
    non-public information about its business, finances, products, markets, and present and
    future business prospects via internal corporate documents conversations and connections
    with other corporate officers and employees, attendance at management and/or board of
    directors meetings and committees thereof and via reports and other information provided
    to them in connection therewith. Because of their possession of such information, the
    Management Defendants knew or recklessly disregarded that the adverse facts specified
    herein had not been disclosed to, and were being concealed from, the investing public.

31.  The Management Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Management Defendants, by reason of their status as senior executive officers and/or directors were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the NQ Mobile to engage in the unlawful conduct complained of herein. Because of their positions of control, the Management Defendants were able to and did, directly or indirectly, control the conduct of NQ Mobile's business.

32. The Management Defendants, because of their positions with NQ Mobile, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Management Defendants were provided with copies of company reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Hence, the Management Defendants had the opportunity to commit the fraudulent acts alleged herein.

33. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was and is registered with the SEC, pursuant to the Exchange Act, and was and is traded on the NYSE, and governed by the federal securities laws, the Management Defendants had a duty to promptly disseminate accurate and truthful information about NQ Mobile's financial condition and performance, growth, operations, financial statements, business, services and products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the

market price of NQ Mobile common stock would be based on truthful and accurate information.  The Management Defendants' misrepresentations and omissions, during the Class Period, violated these obligations.

### IV. CLASS ACTION ALLEGATIONS

34. Plaintiffs bring this suit as a class action under Federal Rule of Civil Procedure 23(a) and (b) (3) on behalf of a class consisting of all those who purchased the common stock of NQ Mobile between November 1, 2013 and May 15, 2015, the Class Period, and those who were damaged thereby. Defendants, NQ Mobile officers and directors, and their immediate family members and their legal representatives, heirs, successors or assigns and any entity in which Defendants have had a controlling interest, are all excluded from the Class.

35. The number of members in the Class is so numerous that joinder is impracticable. Throughout the Class Period, from November 1, 2013 through May 15, 2015, NQ Mobile common stock was actively traded on the NYSE. While Plaintiffs do not know the precise number of Class members, at this time, and while they may estimate membership to be in the hundreds or thousands, the exact number may only be ascertained through proper discovery. NQ Mobile records maintained by NQ Mobile or its transfer agent that reflect record ownership, may be obtained through discovery from NQ Mobile and used to notify record owners of the pendency of this action, by mail, in a manner and form consistent with customary practice of notification for securities class actions.

36. Plaintiffs' claims are typical of those of other Class members because all members of the Class are similarly affected by the wrongful violations of Defendants, in violation of federal securities laws.

37. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class actions and securities litigation.

38. The common questions of law and fact predominate over those questions affecting individual Class members. Common questions of law and fact, amongst the Class members, include:

(a)  Whether Defendants' actions, as alleged herein, violated the federal securities laws;

(b)  Whether Defendants' statements to the investing public, during the Class Period, were misrepresentations of material facts about the business and operations of NQ Mobile;

(c)  Whether the price of NQ Mobile common stock was artificially inflated during the Class Period; and

(d)  The extent to which Class members sustained any damages as a result of Defendants' misrepresentations and what is the proper measure of damages.

39. As stated above, the Class Action is superior to individual actions or a joinder of actions because it will deliver the most fair and efficient adjudication of suit, while being a manageable case. Due to the fact that the damages of individual members may be relatively small, the burden and expense of litigation makes is nearly impossible for individual Class members to file individual actions.

40. Upon the release of the Company's  2013 20F, it appears core security product business revenues are reclassified under a different category of the "new NQ Mobile", in an effort to hide those declining numbers and leave the false impression of solid revenue growth.

### V. UNDISCLOSED ADVERSE FACTS AND FALSE AND MISLEADING DISCLOSURES MADE DURING THE CLASS PERIOD

41. NQ Mobile and Management Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including United States Postal Service, interstate telephone and cellular phone communication, electronic communications, and the facilities of a national securities exchange, in connection with the acts, transactions, and conduct alleged herein.

42. The market for NQ Mobile securities was open, well-developed and efficient at all relevant times. During the Class Period, the Defendants materially misled the investing public, and thus caused the inflation of the price of NQ's securities, by publicly issuing and/or misleading statements and/or failing to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about the NQ, its operations, and prospects as alleged herein. Plaintiffs and other Class members purchased or otherwise acquired NQ Mobile securities relying upon the integrity of the market price of NQ Mobile's securities and market information relating to NQ Mobile, and as a result have been damaged thereby.

43. Specifically, NQ Mobile deliberately and secretively made numerous unmonitored acquisitions of small, private Chinese companies of little or no value, including Showself and Yipai. NQ Mobile and Management Defendants violated federal securities laws by deliberately making material omissions regarding acquisitions that resulted in a 40% dilution of shares, and failing to disclose these May 2014 acquisitions until five and a half months after the acquisitions were complete, on October 27, 2014. NQ Mobile and Management Defendants were aware of the Company's obligations to shareholders, to

14

disclose such transactions, due to the material nature of these transactions and the price impact they would have on the NQ stock. Back in spring 2014, NQ Mobile had failed to cooperate with PWC China and produce documentation of these third party transactions to its longtime auditor who ultimately refused to approve the Company's 2013 20F filing, which was already twice delayed. PWC China effectively resigned and NQ Mobile had to replace it with a new auditor a few weeks later. NQ Mobile's Audit Committee Chairwoman, Ying Han resigned in June/July 2014 and then NQ Mobile's CFO KB Teo, resigned on August 22, 2014. Both of them cited personal reasons for their resignations, despite the fact that work was left undone – with the 2013 20F filing still pending.

44. NQ Mobile had set the stage for this massive fraud on non-insider shareholders, when it moved to amend the Company's bylaws in November 2013, to allow insiders to pledge NQ Mobile stock for personal loans. After this amendment was passed at the December 23, 2014 annual meeting, the highly dilutive and massive handing out of NQ Mobile equity interests began. Once NQ Mobile finally filed the 2013 20F filing, the stock price began to plummet and several more Management Defendants began to resign, including Henry Yu Lin, longtime CEO, his co-CEO Omar Khan, and Director Xiuming Tao. Both executives were cited as leaving for "personal reasons", which brought the total of NQ Mobile executive who resigned from the Company for "personal reasons" to four in six months.

45. At all relevant times, the material misrepresentations and/or omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by the Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants made or caused to be made a series of

materially false and/or misleading statements about NQ's business, financial well-being, as well as material omissions about financial adverse acquisitions. These material misstatements and/or omissions had the cause and effect of creating in the market and unrealistically positive assessment of the NQ and its financial well-being and prospects, thus causing NQ's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in the Plaintiffs and other members of the Class purchasing the NQ's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

46. Defendant's wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by the Plaintiffs and the Class.

47. During the Class Period, the Plaintiffs and the Class Period purchased NQ's securities at artificially inflated prices and were damaged thereby. The price of NQ's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investor's losses.

## SCIENTER ALLEGATIONS

48. As alleged herein, the Defendants acted with scienter in that Defendants knew, or should have known, public documents and statements issued or disseminated in the name of NQ were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly, recklessly, and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth

elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding NQ, their control over, and/or receipt and/or modification of NQ's allegedly materially misleading misstatements and/or their associations with NQ which made them privy to confidential proprietary information concerning NQ, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD ON THE MARKET DOCTRINE

49. At all relevant times, the market for NQ Mobile stock was an efficient market for the following reasons, among others:

    (a) NQ Mobile stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    (b) As a regulated issuer, NQ Mobile filed periodic public reports with the SEC and the NYSE; and

    (c) NQ Mobile regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

50. As a result of the foregoing, the market for NQ Mobile common stock promptly digested current information regarding NQ Mobile from all publicly available sources and reflected such information in NQ Mobile stock price. Under these circumstances, all purchasers of NQ Mobile stock during the Class Period suffered similar injury through their purchase of NQ Mobile stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

51. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statement identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking was authorized and/or approved by an executive officer of NQ Mobile who knew that those statements were false when made.

## FIRST CLAIM

### Violations of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereafter Against All Defendants

52. Plaintiffs repeat and re-allege each and every allegation contained above.

53. During the Class Period, NQ Mobile and Management Defendants carried out an unlawful plan, scheme, and course of conduct which was always intended to, and throughout the Class Period, in fact, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and the Class to purchase NQ Mobile securities at falsely inflated prices. In furtherance of NQ

Mobile and Management Defendants illegal scheme, plan, and course of conduct, they each took the actions set forth herein.

54. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a)Employed devices, schemes and artifices to defraud; (b) Made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) Engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period. NQ Mobile and Management Defendants are being sued herein either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55. NQ Mobile and Management Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including United States Postal Service, interstate telephone and cellular phone communication, electronic communications, and the facilities of a national securities exchange, in connection with the acts, transactions, and conduct alleged herein.

56. NQ Mobile and Management Defendants employed devices, schemes and artifices to defraud the investing public, while they were in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct, as alleged herein, in a deliberate and intentional effort to assure the investing public of NQ Mobile's value and performance and continued sustainable growth, which included, these Defendants making, or participating in the making of, untrue statements regarding material facts and omissions of adverse facts about NQ Mobile and its business operations and financial performance and condition, as set forth with particularity herein, and engaged in transactions, business practices and a course of business which operated

as a fraud upon the good faith purchasers of NQ Mobile securities, during the Class Period.

57. Each Management Defendants' primary liability, and controlling person liability, arises from the following: (i) the Management Defendants were high level executives and/or directors of NQ Mobile during the Class Period and members of NQ Mobile's management team or had control thereof; (ii) each of these Management Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of NQ Mobile's internal budgets, plans, projections and/or reports; (iii) each Management Defendant enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about NQ Mobile's finances, operations, and sales at all relevant times; (iv) each of these defendants was aware of NQ Mobile's dissemination of information to the investing public and they knew or recklessly disregarded the fact that such dissemination was materially false and misleading.

58. As a result of NQ Mobile and Management Defendants dissemination of materially false and/or misleading information, as well as the failure to disclose materially adverse facts, as set forth above, the market price of NQ Mobile securities was artificially inflated during the Class Period. Plaintiffs and the Class have suffered monetary damages, insofar that, in reliance on the integrity of the market, they paid artificially inflated prices for NQ Mobile stock. Plaintiffs and the Class would not have purchased NQ Mobile stock at the prices they paid, or at all, if they had been aware that the market prices had been

artificially and falsely inflated by NQ Mobile and Management Defendants materially

false and/or misleading statements as well as undisclosed materially adverse facts.

59. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the

other members of the Class suffered damages in connection with their purchases of NQ

Mobile common stock during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against the Management Defendants

60. The Management Defendants acted as controlling persons of the Company within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-

level positions, participation in and/or awareness of the Company's operations and/or

intimate knowledge of the statements filed by the Company with the SEC and

disseminated to the investing public, the Management Defendants had the power to

influence and control and did influence and control, directly or indirectly, the decision-

making of the Company, including the content and dissemination of the various

statements which Plaintiff contends are false and misleading. The Management

Defendants were provided with or had unlimited access to copies of NQ Mobile's reports,

press releases, public filings and other statements alleged by Plaintiffs to be misleading

prior to and/or shortly after these statements were issued and had the ability to prevent

the issuance of the statements or cause the statements to be corrected.

61. Specifically, the Management Defendants had direct and supervisory involvement in the

day-to-day operations of the Company either as directors or executive officers and,

therefore, are presumed to have had the power to control or influence the particular

transactions giving rise to the securities violations as alleged herein, and exercised the same.

62. As alleged above, NQ Mobile and the Management Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. As controlling persons, each Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act. Plaintiffs and other class members suffered damages, regarding their purchase of NQ Mobile ADRs as a direct and proximate cause of the wrongful conduct of NQ Mobile and the Management Defendants.

## THIRD CLAIM

### Against All Defendants For Breach Of Fiduciary Duty

63. Plaintiffs repeat and re-allege each and every allegation contained above, except for any allegations sounding in fraud or intentional or reckless misconduct.

64. The Management Defendants owe NQ Mobile fiduciary obligations. By reason of their fiduciary relationships, the Management Defendants owed and owe NQ Mobile the highest obligation of good faith, fair dealing, loyalty and due care.

65. The Management Defendants, each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

66. Each of the defendants authorized, or by abdication of duty, permitted the acquisitions of Showself and Yipai at drastically inflated prices with no lockup restrictions, no votes or shareholder approvals about the acquisitions or dilutions. These actions were not a good faith exercise of prudent business judgment to protect and promote NQ Mobile's corporate interests.

67. As a direct and proximate result of the Defendants' breaches of their fiduciary duties, defendants have caused, and will continue to cause, NQ Mobile to suffer substantial monetary damages, as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to NQ Mobile's reputation, business and good will.

68. NQ Mobile has been directly and substantially injured by reason of the Management Defendants' intentional breach and/or reckless disregard of their fiduciary duties to NQ Mobile.

## FOURTH CLAIM

### Against All Defendants For Gross Mismanagement

69. Plaintiffs repeat and re-allege each and every allegation contained above, except for any allegations sounding in fraud or intentional or reckless misconduct.

70. By their actions alleged herein, the Management Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of NQ Mobile in a manner consistent with operations of a publicly held corporation.

71. As a direct and proximate result of the Management Defendants' gross mismanagement and breaches of duty alleged herein, NQ Mobile has sustained and will continue to sustain significant damages in the millions of dollars.

72. As a result of the misconduct and breaches of duty alleged herein, the Management Defendants are liable to NQ Mobile.

## FIFTH CLAIM

### Against Defendants For Waste of Corporate Assets

73. Plaintiffs repeat and re-allege each and every allegation contained above, as though fully set forth herein.

74. By engaging in the wrongdoing alleged herein, Management Defendants wasted corporate assets by, among other things, improperly granting stock option grants, improperly manipulating stock options, failing to recover improperly secured profits, damaging the goodwill and reputation of NQ Mobile, and exposing NQ Mobile, to civil and criminal liability, for which they are liable.

75. As a direct and proximate result of Management Defendants' wrongful conduct, NQ Mobile has suffered damages in an amount to be proven at trial.

## SIXTH CLAIM
### Against The Management Defendants for Unjust Enrichment and Breach of the Duty of Loyalty

76. Plaintiffs repeat and re-allege each and every allegation contained above, as though fully set forth herein.

77. As a result of the intentional disclosure of materially false and/or misleading statements, as well as undisclosed materially adverse facts, the Management Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of NQ Mobile.

78. Accordingly, this Court should order the Management Defendants to disgorge all profits, benefits and other compensation obtained by the Management Defendants and each of them, from their wrongful conduct and fiduciary breaches described herein.

WHEREFORE, the Plaintiffs prays relief and judgment, as follows:

(A)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(B)    Awarding compensatory damages in favor of the Plaintiffs and the other Class

Members against all Defendants, jointly and severally, for all damages sustained as a

result of the defendant's wrongdoing, in an amount to be proven at trial, including

interest thereon;

(C)    Awarding the Plaintiffs and the Class their reasonable costs and expenses incurred

in this action, including counsel fees and expert fees; and

(D)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

The Plaintiffs hereby demands a trial by jury.


Dated:  September 2, 2015                    Respectfully Submitted,

                                             **LAW OFFICE OF BRIDGET BUTLER, ESQ.**


                                             */s/ Bridget Butler*
                                             Bridget Butler
                                             419 Lafayette Street, #2
                                             New York, New York 10003
                                             (917) 426-3630 (voice)
                                             (646) 355-0128 (facsimile)
                                             bridget72@gmail.com


                                             Edgar Gentle
                                             **GENTLE, TURNER, SEXTON, AND
                                             HARBISON**
                                             Suite 100-501 Riverchase Parkway East
                                             Hoover, Alabama 35244
                                             (205) 716-3000 (voice)
                                             (205) 716-3010 (facsimile)
                                             escrowagen@aol.com


                                             Sterling L. DeRamus
                                             **LAW OFFICES OF STERLING L. DERAMUS**
                                             2229 1st Ave. North

Birmingham, Alabama 35203
(205) 504-0189 (voice)
(205) 449-7392
sderamus@deramuslaw.com

**ATTORNEYS FOR PLAINTIFFS**