UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

DANIEL FINOCCHIARO, ERIC MITCHELL,       Case No.:  1:15-cv-06385-NRB
RICHARD SELBY, YONG HOE TAN,
DAVID COPELAND, DEAN BERGER, JULIEN
BOURDAILLET, CAMILLA HEMPLEMAN,
TERRY HEMPLEMAN, EVAN LITTLE, HAKIM
KABIR, MICHAEL BRYAN,

        **Plaintiff(s),**

                                                    **FOURTH AMENDED**
**vs.**                                            **COMPLAINT**
                                              **FOR VIOLATIONS OF THE**
NQ MOBILE, INC.,                                  **FEDERAL SECURITIES LAWS**
OMAR SHARIF KHAN,
MATTHEW MATHISON.                              <u>JURY TRIAL DEMANDED</u>.

        **Defendant(s).**

------------------------------------------------------

       DANIEL FINOCCHIARO, ERIC MITCHELL, RICHARD SELBY, YONG HOE TAN,

DAVID COPELAND, DEAN BERGER, JULIEN BOURDAILLET, CAMILLA

HEMPLEMAN, TERRY HEMPLEMAN, EVAN LITTLE, HAKIM KABIR, MICHAEL

BRYAN  (hereinafter "Plaintiffs") bring this action by and through their attorneys Bridget E.

Butler, Esq., on behalf of themselves, and allege the following based on the investigation of

counsel, and the specific allegations based on Plaintiffs' personal knowledge. The investigation

of counsel included, but is not limited to, a review of NQ Mobile Inc's (hereinafter "NQ Mobile"

or "Company") public filings with the United States Securities and Exchange Commission

("SEC"), press releases issued by NQ Mobile, media news reports on NQ Mobile and other

publicly available information, including, but not limited to, price and trading volume of the

Company's American Depository Receipts ("ADRs") and analyst reports. Plaintiffs' personal

knowledge includes numerous phone calls with NQ Mobile Investor Relations Department, various face-to-face meetings with NQ management, and email exchanges with NQ Mobile regarding various issues surrounding the allegations in this Complaint.

## **NATURE OF THE ACTION**

1. This is a federal action against NQ Mobile, Inc. ("NQ Mobile" or "Company") and certain of its officers, alleging violations of federal securities laws. Plaintiffs brings this action on behalf of themselves, investors who have purchased shares of NQ Mobile between November 1, 2013 and May 15, 2015 ("Class Period"), pursuing remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. NQ Mobile is a global provider of mobile Internet services that was formed in 2005. It was listed on the New York Stock Exchange ("NYSE") in 2011, in an $89 million traditional initial public offering underwritten by Piper Jaffrey. The Company raised $69 million more the following year, from a secondary offering, underwritten by Morgan Stanley and Deutsche Bank AG.  NQ's portfolio includes mobile security and mobile games as well as advertising for the consumer market and consulting, mobile platforms mobility services for the enterprise market.  NQ Mobile is a public company, listed on the NYSE as "NQ". NQ Mobile is considered a small-cap stock with a total market capitalization of $479 million. On May 9, 2014, NQ Mobile stock was trading at $11.97 a share. A year later, in May 2014, it was trading at $3.78 per share.

3. On October 24, 2013, shares of NQ Mobile opened at $23 a share and closed at $12.09, after the Muddy Waters Research Group ("MWRG") publicly issued a scathing report on NQ Mobile, calling the Company a "massive fraud", and marking it as a "strong sell". MWRG accused NQ Mobile of falsifying financial statements, bank accounts, and

information like market share and paying user base in China. MWRG accused NQ

Mobile of manufacturing its own revenue which really came from a shell company

Yidatong, a payment processor, controlled by NQ Mobile. MWRG claimed that "NQs

largest customer is really NQ," and that NQ Mobile was fraudulently engaged in

continuous round tripping transactions to bolster revenues. NQ Mobile settled two class

actions, one in this court and the other in the federal district court in Massachusetts, based

largely on the revelations made in this MWRG report, which pertain to events

surrounding NQ Mobile's initial public offering.

4.   Entirely separate and apart from the events that lead to the MWRG report and subsequent

litigation, on December 23, 2013, at the NQ Mobile annual meeting, two months after the

MWRG report was published, NQ Mobile shareholders voted to amend the Company

bylaws to allow Management to pledge their NQ Mobile shares for personal loans. The

Securities and Exchange Commission ("SEC") does not require insiders of Chinese-based

companies that trade on the New York Stock Exchange as an American Depository

Receipts ("ADRs") to disclose pledges of stock for personal loans. Then in 2014, NQ

Mobile abruptly made a number of deliberate and secretive acquisitions that lead,

ultimately, to severe dilution of shares and shareholder losses.

5.   Separate and beyond the accusations by MWRG, in October 2013, primarily in 2014 and

early 2015, NQ Mobile engaged in deceptive business practices which resulted in the

defrauding of NQ Mobile investors, specifically, with regard to a unique pattern of

acquiring small, private web-based Chinese companies, particularly in 2014, in the same

two-step process, that ultimately leads to drastic dilution of shares. The Company's

acquisition process routinely began with NQ Mobile making an initial minority purchase,

of a target company, usually with cash and sometimes part equity as well. Then NQ Mobile would make a majority purchase - always with equity. In the interim period, the target company experienced rapid growth and expansion that appears to be the result of significant funding. Then NQ Mobile pays a premium, always in equity, for a majority holding of the target company. The target companies are given large amounts of NQ Mobile shares to then sell on the open market and repay loans, resulting in NQ Mobile, or Management Defendants, aka, NQ Mobile insiders, being reimbursed for previous investments. So NQ Mobile has an incentive to pay far over fair market value for a target company. In fact, NQ Mobile has consistently done just that, in recent years– overpay in a second majority purchase of a target company, always with equity.

6. The interim periods between the initial minority purchase and the second majority purchase, the "growth" period, in these acquisitions, involves companies that are technically "third parties" and therefore disclosures of all aspects of these transactions are not required. This secretive acquisition strategy has allowed the Company to expand while temporarily avoiding the negative consequences of a secondary offering, on the open market. The execution of this strategy resulted in drastically diluted shareholder value, unbeknownst to them, and ensured that shareholder value will not rise in the long term.

7. Specifically, in May 2014, NQ Mobile acquired several small private Chinese companies and failed to disclose these acquisitions until a 20F filing on October 27, 2014, six months later. On May 15, 2014, NQ Mobile acquired another 45% equity interest in, Beijing Showself Technology Co., Ltd. ("Showself"), a Chinese webcam chat site and

mobile application, with largely poor reviews.[1] The cost was $77,000 in cash and 29,950,000 shares for the 45% in May 2014. With the stock trading between $7 and $12 during the month of May 2014, the cost of this additional 45% interest in Showself is estimated to be somewhere between $45 million to $75 million. NQ Mobile paid far over market value for the shares on May 15, 2014, and caused drastic dilution of stock as a direct result of the purchase.

8.  Again, in May 2014, NQ Mobile acquired a 70% stake in Yipai Tianxia Network Technology Limited ("Yipai") for $7 million in cash and 33,900,125 shares. This stock was trading between $7 to $12 during the month of May 2014, which means the total cost of this acquisition, for a 70% interest in Yipai was somewhere between $54 million to $89 million. Yipai is a mobile advertising company according to NQ Mobile and their website is expai.com. This company has a few mobile applications available on iTunes with no ratings or reviews, and only 100 to 500 downloads on Google Play. No independent analysis of similar companies would value such an entity, with such a small number of product purchases, anywhere near $54 million. NQ Mobile paid far over market value for the Yipai shares, and caused drastic dilution of stock as a direct result of this acquisition.

9.  In sum, NQ Mobile spent around $13 million in cash and 137 million common shares to acquire stakes in several private Chinese companies, in 2014, including, but not limited to,  Showself and Yipai. With 1 American Depository Shares ("ADS") being equal to 5 common shares that is equivalent to over 27 million ADS, which were used for acquisitions. NQ Mobile has not explained why the acquisitions were made, in the first

---

[1] Reviews of the Showself mobile application, on www.AppAnnie.com, are relatively poor, with 15 out of 40 referring to Showself as "garage", "junk", "rubbish", in addition to some Chinese language that translates to "con man", "fraud", "cheated" and "liar". www.showself.com

place, and there is no evidence that the costs were justified and in the best interest of NQ Mobile and its shareholders.

10. On July 6, 2014, NQ Mobile announced the resignation of Ying Han; from the NQ Mobile board director position and Chairwoman of Audit Committee. NQ Mobile stock traded heavily in the week leading up to this announcement.

11. On July 18, 2014, NQ Mobile announced the replacement of its auditor PriceWaterhouseCoopers China ("PWC China") with that of Marcum Bernstein Pinchuk LLP, ("MBP") after PWC China would not endorse the SEC 2013 20F filing, the NQ Mobile 2013 annual report, without reviewing documentation related to third-party transactions. Those transactions were so significant, PWC China would not move forward without reviewing them. NQ Mobile never produced such documentation and instead replaced the auditors.

12. On July 30, 2014, NQ Mobile publicly announced a non-binding offer from U.S. based Bison Capital Holding Company Limited ("Bison"), to acquire all of NQ Mobile's outstanding ordinary shares and ADS for a fixed cash consideration of $9.80 a share. In the month of August 2014, NQ Mobile stock price ranged in value between $6.44 and $6.91, per share, and the average price from August to June averaged $6.46 per share. Despite shareholder demands, NQ Mobile never accepted this offer, when the stock never traded as high as $9.80.  In fact, between July 31, 2014 and November 1, 2014, NQ Mobile was trading between $5.77 and $9.46, and NQ Mobile CEO Omar Khan and Matthew Mathison, Vice President of Capital Markets, were both telling investors the Company was worth much more than $9.80 per share, and the Company would not

accept this buyout offer. Omar Khan and Matthew Mathison told investors that NQ Mobile was worth "billions".

13. In August and September 2014, Omar Khan and Matthew Mathison told investors, including Richard Selby, Daniel Finocchiaro, and, upon information and belief, numerous other NQ investors, in many private meetings, that NQ would not accept the Bison offer because it undervalued the company which was "worth billions". In fact, Mr. Mathison knew that Mr. Selby and, upon information and belief, other NQ investors would publish his statements on the internet, and elsewhere, to a target audience of investors and potential investors, so Mr. Mathison literally told Mr. Selby what to write. Specifically, Mr. Mathison told Mr. Selby, in the presence of witnesses, that NQ was "worth billions" and the Bison offer "dramatically undervalued the company". Immediately following the private meeting Mr. Selby, and others, had with Matt Mathison, Mr. Selby published the article, with Mr. Mathison's edits, included. NQ stock saw a rise in options and stock purchases immediately thereafter.

14. The twice delayed filing of the NQ 2013 20F was finally made on October 27, 2014.  In exhibits to this 2013 20F filing, NQ's acquisitions of Showself and Yipai, among other companies were disclosed. Stock began trading, that day, at $10.46. Within a few hours of the regulatory filing, the stock began trading lower, after the public had an opportunity to read the entire filing. The stock closed, trading at $7.31. The very next day, October 28, 2014, NQ issued a public statement announcing that the NQ Board "formally rejects the Bison Capital Privatization Offer" of buying NQ Mobile for outstanding ordinary shares and ADS for a fixed cash consideration of $9.80 per share. The value of the NQ stock continued to decline, immediately.

## II.     JURISDICTION AND VENUE

15. The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule
    10b-5 promulgated thereunder and under Sections 11, 12(a) (2) and 15 of the Securities
    Act. Jurisdiction is conferred by Section 27 of the Exchange Act and Section 22 of the
    Securities Act.

16. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15
    U.S.C. §78aa and 28 U.S.C. §139(b). Some of the acts and transactions alleged herein,
    including the preparation and dissemination and of materially false and misleading
    information, occurred in substantial part, in this District.

17. In connection with the acts alleged in this Complaint, Defendants directly or indirectly,
    used the means and instrumentalities of interstate commerce, including, but not limited
    to, the mails, interstate telephone communications and the facilities of the national
    securities markets.

## III. PARTIES

18. Plaintiff, Daniel Finocchiaro, purchased common stock of NQ Mobile during the Class
    Period, and has been damaged thereby.

19. Plaintiff, Richard Selby, purchased common stock of NQ Mobile during the Class Period,
    and has been damaged thereby.

20. Plaintiff, David Copeland, purchased common stock of NQ Mobile during the Class
    Period, and has been damaged thereby.

21. Plaintiff, Eric Mitchell, purchased common stock of NQ Mobile during the Class Period,
    and has been damaged thereby.

22. Plaintiff, Yong Hoe Tan, purchased common stock of NQ Mobile during the Class Period, and has been damaged thereby.

23. Plaintiff, Dean Berger, purchased common stock of NQ Mobile during the Class Period, and has been damaged thereby.

24. Plaintiff, Julien Bourdaillet, purchased common stock of NQ Mobile during the Class Period, and has been damaged thereby.

25. Plaintiff, Camille Hempleman, purchased common stock of NQ Mobile during the Class Period, and has been damaged thereby.

26. Plaintiff, Terry Hempleman, purchased common stock of NQ Mobile during the Class Period, and has been damaged thereby.

27. Plaintiff, Evan Little, purchased common stock of NQ Mobile during the Class Period, and has been damaged thereby.

28. Plaintiff, Hakim Kabir, purchased common stock of NQ Mobile during the Class Period, and has been damaged thereby.

29. Plaintiff, Michael Bryan, purchased common stock of NQ Mobile during the Class Period, and has been damaged thereby.

### 1.  The NQ Mobile Defendants

30. NQ Mobile, formerly "Netquin Mobile Inc.," is a company founded in 2005, in Beijing, China with dual headquarters in Beijing, China and Dallas, Texas. NQ Mobile purports to be a non-carrier provider of mobile internet services. NQ Mobile's services and products allegedly include mobile security, mobile games, advertising and consulting for the consumer market, as well as, mobile platforms and mobile services for the enterprise

market. NQ Mobile stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "NQ".

31. The following officer and employee of NQ Mobile (the "Management Defendants") are also defendants in this action. They include former senior officer and current employee:

A. OMAR SHARIF KHAN,
B. MATTHEW MATHISON.


32. During the Class Period, the Management Defendants, as senior executive officer, and/or employees of NQ Mobile, were privy to confidential and proprietary information concerning NQ Mobile, its operations, finances, financial condition and present and future business prospects. The Management Defendants also had access to material adverse non-public information, concerning NQ Mobile, as discussed in detail below. Because of their positions with NQ Mobile, the Management Defendants had access to non-public information about its business, finances, products, markets, and present and future business prospects via internal corporate documents conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Management Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

33.  The Management Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Management Defendants, by reason of their status as senior executive officers and/or employees were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the NQ

Mobile to engage in the unlawful conduct complained of herein. Because of their positions of control, the Management Defendants were able to and did, directly or indirectly, control the conduct of NQ Mobile's business.

34. The Management Defendants, because of their positions with NQ Mobile, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Management Defendants were provided with copies of company reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Hence, the Management Defendants had the opportunity to commit the fraudulent acts alleged herein.

35. As senior executive officers and/or employees and as controlling persons of a publicly traded company whose common stock was and is registered with the SEC, pursuant to the Exchange Act, and was and is traded on the NYSE, and governed by the federal securities laws, the Management Defendants had a duty to promptly disseminate accurate and truthful information about NQ Mobile's financial condition and performance, growth, operations, financial statements, business, services and products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of NQ Mobile common stock would be based on truthful and accurate information.  The Management Defendants' misrepresentations and omissions, during the Class Period, violated these obligations.

## IV. ALLEGATIONS

11

36. Plaintiffs now bring this suit as a non-class action, on behalf of the plaintiffs, who purchased the common stock of NQ Mobile between November 1, 2013 and May 15, 2015, the Class Period, and those who were damaged thereby. Defendants, NQ Mobile officers and directors, and their immediate family members and their legal representatives, heirs, successors or assigns and any entity in which Defendants have had a controlling interest, are all excluded from the Class.

37. The Plaintiffs are joined in this action. Throughout the Class Period, from November 1, 2013 through May 15, 2015, NQ Mobile common stock was actively traded on the NYSE. While Plaintiffs do not know the precise number of Plaintiffs, at this time, and while they may estimate membership to be in the hundreds or thousands, the exact number may only be ascertained through proper discovery. NQ Mobile records maintained by NQ Mobile or its transfer agent that reflect record ownership, may be obtained through discovery from NQ Mobile and used to notify record owners of the pendency of this action, by mail, in a manner and form consistent with customary practice of notification for securities class actions.

38. Plaintiffs' claims are similar because all members of the Plaintiffs are similarly affected by the wrongful violations of Defendants, in violation of federal securities laws.

39. The common questions of law and fact predominate over those questions affecting individual Plaintiffs. Common questions of law and fact, amongst the Plaintiffs, include:

    (a)  Whether Defendants' actions, as alleged herein, violated the federal securities laws;

    (b)  Whether Defendants' statements to the investing public, during the Class Period, were misrepresentations of material facts about the business and operations of NQ Mobile;

(c)  Whether the price of NQ Mobile common stock was artificially inflated during the

Class Period; and

(d)  The extent to which Class members sustained any damages as a result of Defendants'

misrepresentations and what is the proper measure of damages.

40. Upon the release of the Company's  2013 20F, it appears core security product business

revenues are reclassified under a different category of the "new NQ Mobile", in an effort

to hide those declining numbers and leave the false impression of solid revenue growth.

## V. <u>UNDISCLOSED ADVERSE FACTS AND FALSE AND MISLEADING DISCLOSURES MADE DURING THE CLASS PERIOD</u>

41. NQ Mobile and Management Defendants directly and indirectly used the means and

instrumentalities of interstate commerce, including United States Postal Service,

interstate telephone and cellular phone communication, electronic communications, and

the facilities of a national securities exchange, in connection with the acts, transactions,

and conduct alleged herein.

42. The market for NQ Mobile securities was open, well-developed and efficient at all

relevant times. During the Class Period, the Defendants materially misled the investing

public, and thus caused the inflation of the price of NQ's securities, by publicly issuing

and/or misleading statements and/or failing to disclose material facts necessary to make

Defendants' statements, as set forth herein, not false and/or misleading. Said statements

and omissions were materially false and/or misleading in that they failed to disclose

material adverse information and/or misrepresented the truth about the NQ, its

operations, and prospects as alleged herein. Plaintiffs purchased or otherwise acquired

NQ Mobile securities relying upon the integrity of the market price of NQ Mobile's

securities and market information relating to NQ Mobile, and as a result have been damaged thereby.

43. Specifically, NQ Mobile deliberately and secretively made numerous unmonitored acquisitions of small, private Chinese companies of little or no value, including Showself and Yipai. NQ Mobile and Management Defendants violated federal securities laws by deliberately making material omissions regarding acquisitions that resulted in a 40% dilution of shares, and failing to disclose these May 2014 acquisitions until five and a half months after the acquisitions were complete, on October 27, 2014, and during that period after July 30, 2014, publicly stated that NQ Mobile was worth billions and told investors that the Company would not accept a buyout offer from Bison Capital, of $9.80 per share because that offer was too low. NQ Mobile and Management Defendants were aware of the Company's obligations to shareholders, to disclose transactions that were so material in nature that they would have a significant price impact on the NQ stock. Back in spring 2014, NQ Mobile had failed to cooperate with PWC China and produce documentation of these third party transactions to its longtime auditor who ultimately refused to approve the Company's 2013 20F filing, which was already twice delayed. PWC China effectively resigned and NQ Mobile had to replace it with a new auditor a few weeks later. NQ Mobile's Audit Committee Chairwoman, Ying Han resigned in June/July 2014 and then NQ Mobile's CFO KB Teo, resigned on August 22, 2014. Both of them cited personal reasons for their resignations, despite the fact that work was left undone – with the 2013 20F filing still pending.  However, as stated above, NQ Mobile announced a buyout offer from Bison Capital, on July 30, 2014, of $9.80 and subsequently refused to accept it, telling investors the Company was worth "billions" and certainly more than

such an offer. NQ Mobile and Management Defendants acted intentionally or recklessly in public statements with regard to the Company's true value, being in the "billions", while at the same time, failing to disclose material information to investors that was completely contradictory to those value statements.

44. NQ Mobile had set the stage for this massive fraud on non-insider shareholders, when it moved to amend the Company's bylaws in November 2013, to allow insiders to pledge NQ Mobile stock for personal loans. After this amendment was passed at the December 23, 2014 annual meeting, the highly dilutive and massive handing out of NQ Mobile equity interests began. Once NQ Mobile finally filed the 2013 20F filing, the stock price began to plummet and several more Management Defendants began to resign, including, co-CEO Omar Khan. This executive was cited as leaving for "personal reasons", which brought the total of NQ Mobile executive who resigned from the Company for "personal reasons" to four in six months.

45. At all relevant times, the material misrepresentations and/or omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by the Plaintiffs. As described herein, during the Class Period, the Defendants made or caused to be made a series of materially false and/or misleading statements about NQ's business, financial well-being, as well as material omissions about financial adverse acquisitions. These material misstatements and/or omissions had the cause and effect of creating in the market and unrealistically positive assessment of the NQ and its financial well-being and prospects, thus causing NQ's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in the Plaintiffs purchasing

the NQ's securities at artificially inflated prices, thus causing the damages complained of herein. Once the delayed 2013 20F filing was made on October 27, 2014, the Company, for the first time, disclosed the relevant acquisitions and the actual extent of stock dilution was made known to investors, for the first time. From this point forward, the price of NQ Mobile stock declined and continued to decline, and has never rebounded to the level it was prior to this delayed disclosure.

## LOSS CAUSATION

46. Defendant's wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by the Plaintiffs.

47. During the Class Period, the Plaintiffs purchased NQ's securities at artificially inflated prices and were damaged thereby. The price of NQ's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investor's losses.

## SCIENTER ALLEGATIONS

48. As alleged herein, the Defendants – NQ Mobile, Omar Sharif Khan, and Matthew Mathison acted with scienter in that Defendants knew, or should have known that the omission of material information regarding NQ Mobile's 2014 acquisitions coupled with public statements disseminated in the name of NQ, at the time that Bison Capital had an outstanding buyout offer of $9.80 per share, between July and October 2014, were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly, recklessly, and substantially participated or acquiesced in the issuance or dissemination of such

statements or documents, for the sole purpose of inflating the Company's stock price, as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding NQ, their control over, and/or receipt and/or modification of NQ's allegedly materially misleading misstatements and/or their associations with NQ which made them privy to confidential proprietary information concerning NQ, participated in the fraudulent scheme alleged herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD ON THE MARKET DOCTRINE

49. At all relevant times, the market for NQ Mobile stock was an efficient market for the following reasons, among others:

   (a) NQ Mobile stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

   (b) As a regulated issuer, NQ Mobile filed periodic public reports with the SEC and the NYSE; and

   (c) NQ Mobile regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

50. As a result of the foregoing, the market for NQ Mobile common stock promptly digested current information regarding NQ Mobile from all publicly available sources and reflected such information in NQ Mobile stock price. Under these circumstances, all purchasers of NQ Mobile stock during the Class Period suffered similar injury through

their purchase of NQ Mobile stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

51. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statement identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking was authorized and/or approved by an executive officer of NQ Mobile who knew that those statements were false when made.

## FIRST CLAIM

### Violations of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereafter Against All Defendants

52. Plaintiffs repeat and re-allege each and every allegation contained above.

53. During the Class Period, NQ Mobile and Management Defendants carried out an unlawful plan, scheme, and course of conduct which was always intended to, and throughout the Class Period, in fact, did: (i) deceive the investing public, including Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to purchase NQ Mobile securities at

falsely inflated prices. In furtherance of NQ Mobile and Management Defendants illegal scheme, plan, and course of conduct, they each took the actions set forth herein.

54. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a)Employed devices, schemes and artifices to defraud; (b) Made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) Engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period. NQ Mobile and Management Defendants are being sued herein either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55. NQ Mobile and Management Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including United States Postal Service, interstate telephone and cellular phone communication, electronic communications, and the facilities of a national securities exchange, in connection with the acts, transactions, and conduct alleged herein.

56. NQ Mobile and Management Defendants employed devices, schemes and artifices to defraud the investing public, while they were in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct, as alleged herein, in a deliberate and intentional effort to assure the investing public of NQ Mobile's value and performance and continued sustainable growth, which included, these Defendants making, or participating in the making of, untrue statements regarding material facts and omissions of adverse facts about NQ Mobile and its business operations and financial performance and condition, as set forth with particularity herein, and engaged in transactions, business practices and a course of business which operated

as a fraud upon the good faith purchasers of NQ Mobile securities, during the Class Period.

57. Each Management Defendants' primary liability, and controlling person liability, arises from the following: (i) the Management Defendants were high level executives and/or directors of NQ Mobile during the Class Period and members of NQ Mobile's management team or had control thereof; (ii) each of these Management Defendants, by virtue of their responsibilities and activities as a senior officer and/or employee, was privy to and participated in the creation, development and reporting of NQ Mobile's internal budgets, plans, projections and/or reports; (iii) each Management Defendant enjoyed significant personal contact and familiarity with the other defendant and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about NQ Mobile's finances, operations, and sales at all relevant times; (iv) each of these defendants was aware of NQ Mobile's dissemination of information to the investing public and they knew or recklessly disregarded the fact that such dissemination was materially false and misleading.

58. As a result of NQ Mobile and Management Defendants dissemination of materially false and/or misleading information, as well as the failure to disclose materially adverse facts, as set forth above, the market price of NQ Mobile securities was artificially inflated during the Class Period. Plaintiffs have suffered monetary damages, insofar that, in reliance on the integrity of the market, they paid artificially inflated prices for NQ Mobile stock. Plaintiffs would not have purchased NQ Mobile stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated

by NQ Mobile and Management Defendants materially false and/or misleading

statements as well as undisclosed materially adverse facts.

59. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs

suffered damages in connection with their purchases of NQ Mobile common stock during

the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against the Management Defendants

60. The Management Defendants acted as controlling persons of the Company within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-

level positions, participation in and/or awareness of the Company's operations and/or

intimate knowledge of the statements filed by the Company with the SEC and

disseminated to the investing public, the Management Defendants had the power to

influence and control and did influence and control, directly or indirectly, the decision-

making of the Company, including the content and dissemination of the various

statements which Plaintiff contends are false and misleading. The Management

Defendants were provided with or had unlimited access to copies of NQ Mobile's reports,

press releases, public filings and other statements alleged by Plaintiffs to be misleading

prior to and/or shortly after these statements were issued and had the ability to prevent

the issuance of the statements or cause the statements to be corrected.

61. Specifically, the Management Defendants had direct and supervisory involvement in the

day-to-day operations of the Company either as directors or executive officers and,

therefore, are presumed to have had the power to control or influence the particular

transactions giving rise to the securities violations as alleged herein, and exercised the same.

62. As alleged above, NQ Mobile and the Management Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. As controlling persons, each Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act. Plaintiffs suffered damages, regarding their purchase of NQ Mobile ADRs as a direct and proximate cause of the wrongful conduct of NQ Mobile and the Management Defendants.


WHEREFORE, the Plaintiffs prays relief and judgment, as follows:

(A)   Awarding compensatory damages in favor of the Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(B)   Awarding the Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(C)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

The Plaintiffs hereby demands a trial by jury.


Dated:  May 10, 2017                          Respectfully Submitted,

                                              **LAW OFFICE OF BRIDGET BUTLER, ESQ.**


                                               */s/ Bridget Butler*
                                              Bridget Butler
                                              419 Lafayette Street, #2

New York, New York 10003
(917) 426-3630 (voice)
(646) 355-0128 (facsimile)
bridget72@gmail.com


**ATTORNEYS FOR PLAINTIFFS**