UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
DANIEL FINOCCHIARO, ERIC MITCHELL,
RICHARD SELBY, YONG HOE TAN,
DAVID COPELAND, DEAN BERGER,
JULIEN BOURDAILLET, CAMILLA HEMPLEMAN,
TERRY HEMPLEMAN, EVAN LITTLE,
HAKIM KABIR, and MICHAEL BRYAN,

        Plaintiffs,                  **MEMORANDUM AND ORDER**

     - against -                 15 Civ. 6385 (NRB)

NQ MOBILE, INC., OMAR SHARIF KHAN,
MATTHEW MATHISON,

        Defendants.
-------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


This federal securities action is brought on behalf of twelve persons who purchased shares of defendant NQ Mobile, Inc. ("NQ") between November 1, 2013 and May 15, 2015.  Plaintiffs allege that NQ, as well as its CEO Omar Sharif Khan ("Khan") and Vice President Matthew Mathison ("Mathison") (collectively, "defendants"), violated the federal securities laws by making affirmative misstatements as to NQ's value, and by failing to disclose to investors certain material facts relating to NQ's corporate acquisition strategy, thereby damaging plaintiffs when the truth was subsequently revealed.  Plaintiffs' fourth amended complaint ("FAC") claims that defendants' misrepresentations and omissions violated Section 10(b) of the Securities Exchange Act of 1934 (the

1

"Exchange Act") and Rule 10b-5 promulgated thereunder, and that Khan and Mathison are additionally liable for violations of Section 20(a) of the Exchange Act. Defendants now move, pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), to dismiss the FAC. In response, plaintiffs seek leave to amend the FAC to cure any potential deficiencies. For the reasons discussed below, plaintiffs' FAC is dismissed with prejudice.

## BACKGROUND

### I.    Factual Background

Founded in 2005 and based in Beijing, NQ is a global provider of mobile internet services, with a platform including mobile security and games, advertising and consulting for the consumer market, and mobile platforms and mobility services for the enterprise market. FAC ¶ 2. NQ went public in 2011 through an initial public offering ("IPO") of its American Depository Shares ("ADSs") on the New York Stock Exchange, raising $89 million. Id. NQ raised an additional $69 million in a 2012 secondary offering, and "is considered a small-cap stock with a total market capitalization of $479 million." Id.

Beginning with the filing of its Form F-1 with the Securities and Exchange Commission ("SEC") in March 2011, NQ disclosed its strategy of corporate growth through acquisitions. See

2

Declaration of Scott D. Musoff ("Musoff Decl.") Ex. C, at 21 ("Our strategy includes plans to grow both organically and through acquisitions."); id. Ex. D (Fiscal Year 2011 Form 20-F), at 14 (same).[1]  In 2013, NQ filed its Fiscal Year 2012 Form 20-F, in which it reminded shareholders of its "plan to grow both organically and through acquisitions," and detailed several acquisitions it had made in the past year.  Id. Ex. B, at 7.  NQ also acknowledged and explained the risks associated with its acquisition strategy, including "the inability to generate sufficient revenue to offset the costs and expenses of acquisitions, and potentially significant loss of investments."  Id.  "If we are not able to realize the benefits envisioned for our acquisitions . . . , our overall profitability and growth plans may be adversely affected."  Id.

NQ specifically warned investors of the risks associated with funding acquisitions with ADSs:  "[I]f we pay for our future acquisitions in whole or in part with additionally issued . . . ADSs, [shareholders'] ownership interests in our company would be diluted and this, in turn, could have a material adverse effect on the price of our ADSs."  Id. at 33.  Indeed, as NQ acknowledged, "[t]he trading price of our ADSs may continue to be volatile and

---

[1]  Courts may take judicial notice of filings with the SEC when considering a motion to dismiss.  See, e.g., In re China Organic Sec. Litig., No. 11 Civ. 8623(JMF), 2013 WL 5434637, at *1 (S.D.N.Y. Sept. 30, 2013)(citing Citadel Equity Fund Ltd. v. Aquila, Inc., 168 F. App'x 474, 476 (2d Cir. 2006)).

subject to wide fluctuations in response to factors including . . . acquisitions." Id. at 32.  Finally, NQ explained that "corporate actions are substantially controlled by our directors, executive officers, and other principal shareholders" ["collectively hold[ing] approximately 87.5% of the total voting power of our outstanding common shares"] "who can exert significant influence over important corporate matters, which may reduce the price of [the Company's] ADSs and deprive [the shareholders] of an opportunity to receive a premium for [their] shares." Id. at 35.

Consistent with its growth-by-acquisition strategy, NQ engaged in a variety of corporate acquisitions in 2014, two of which are relevant to this litigation.  On May 15, 2014, NQ acquired a 45% equity interest in Beijing Showself Technology Co., Ltd. ("Showself"), a Chinese webcam chat site, for $77,000 in cash and 29,950,000 ADSs.  FAC ¶ 7.  Also in May 2014, NQ acquired a 70% equity interest in Yipai Tianxia Network Technology Limited ("Yipai"), a mobile advertising company, for $7 million in cash and 33,900,125 ADSs.  Id. ¶ 8.  The FAC describes the structure of the acquisitions as follows.  NQ made an initial minority purchase of the target companies, "usually with cash and sometimes [with] equity as well."  Id. ¶ 5.  Afterwards, the targets "experienced rapid growth and expansion that appears to be the result of significant funding" from NQ.  Id.  Then, NQ made majority purchases of the targets, "always with equity."  Id.  The targets

4

then sold the equity on the open market to repay loans to NQ, meaning that NQ allegedly "ha[d] an incentive to pay far over fair market value for a target company."  Id.

Around the same time, NQ was courted to be acquired itself. On July 30, 2014, NQ "publicly announced" a non-binding offer from Bison Capital Holding Company Limited ("Bison") to acquire all of NQ's outstanding ordinary shares and ADSs for a "fixed cash consideration" of $9.80 per ADS, with each ADS being equivalent to five ordinary shares.  Id. ¶¶ 9, 12.

Then, in August and September 2014, Khan (CEO) and Mathison (Vice President of Capital Markets) allegedly told Richard Selby ("Selby"), Daniel Finocchiaro ("Finocchiaro")—both plaintiff shareholders—"and, upon information and belief, numerous other NQ investors, in many private meetings, that NQ would not accept the Bison offer because it undervalued the company which was 'worth billions.'"  Id. ¶ 13.  Mathison did so, according to plaintiffs, knowing that Selby would publish his statement on the internet, which he did.  Id.  "NQ stock saw a rise in options and stock purchases immediately thereafter."  Id.

NQ disclosed the Showself and Yipai acquisitions in its Fiscal Year 2013 Form 20-F, filed with the SEC on October 27, 2014.[2]  Id.

---

[2]  Filing of the Fiscal Year 2013 Form 20-F was "delayed."  FAC ¶ 14. This delay occurred, according to plaintiffs, because NQ had replaced Pricewaterhouse Coopers China ("PWC China"), its auditor, after PWC China "would not endorse" the filing "without reviewing documentation related to third-party transactions."  Id. ¶ 11.

¶ 14.   After this announcement, NQ's stock price decreased from $10.46 (opening) to $7.31 (closing).[3]  Id.  The next day, NQ issued a "public statement" announcing that the NQ Board of Directors "'formally rejects the Bison Capital Privatization Offer' of buying NQ Mobile for outstanding ordinary shares and ADS[s] for a fixed cash consideration of $9.80 per share."[4]  Id.  Thereafter, "[t]he value of the NQ stock continued to decline, immediately."[5] Id.

## II.  Procedural Background

Plaintiffs filed their initial complaint, styled as a class action, in August 2015, asserting claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, along with several common law claims.  See ECF No. 2.  Plaintiffs filed a similar, amended complaint in September 2015.  See ECF No. 11.

---

[3]  According to Google Finance, NQ's share price closed on October 27, 2014 at $9.46, rather than $7.31 as plaintiffs allege.  See Musoff Decl. Ex. F; see also Ganino v. Citizens Utils. Co., 228 F.3d 154, 166 n.8 (2d Cir. 2000) (holding that Courts are entitled to "take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment").

[4]  Given that plaintiffs assert that the truth was revealed to the market on October 27 and 28, 2014, we are unable to discern the connection with the pleaded time period during which plaintiffs purchased NQ shares: November 1, 2013 to May 15, 2015.  See FAC ¶¶ 1, 14.

[5]  On October 28, 2014, NQ's share price decreased from $9.55 (opening) to $8.00 (closing), with the lowest trading price of $7.94.  See Musoff Decl. Ex. F.

In November 2015, plaintiffs filed a second amended complaint, abandoning their common law claims. See ECF No. 23. In January 2016, defendants notified this Court of their intent to move to dismiss the litigation, and, alternatively, to strike the second amended complaint for plaintiffs' noncompliance with the PSLRA. See ECF Nos. 34, 37. Specifically, defendants alleged that plaintiffs had failed to publish any notice of the purported class action or to move for appointment of a lead plaintiff. ECF Nos. 34, 37. Thereafter, this Court granted plaintiffs leave to file a third amended complaint, and to comply with the PSLRA's notice and lead plaintiff requirements. ECF No. 41. Plaintiffs filed their third amended complaint in March 2016, advancing substantially the same claims as the second amended complaint, although alleging a slightly shorter class period. See ECF No. 42. Plaintiffs also published notice of the class action, albeit with the incorrect deadline for potential class members to seek appointment as lead plaintiff. See Finocchiaro v. NQ Mobile, Inc., No. 15 Civ. 6385 (NRB), 2016 WL 7031613, at *2 (S.D.N.Y. Dec. 1, 2016). Thereafter, plaintiff Finocchiaro moved to be appointed lead plaintiff, which this Court denied in December 2016. See id. at *4.

Plaintiffs' counsel subsequently requested a thirty day extension to file a new motion to appoint a lead plaintiff and lead counsel, which this Court granted "with some reluctance since

7

the reason behind the need for an extension was not readily apparent." ECF No. 59. Plaintiffs then filed a motion to appoint a different lead plaintiff, Julien Bourdaillet ("Bourdaillet"), and requested that this Court grant yet another extension so that plaintiffs could file "a supplemental application for approval of lead counsel." ECF No. 64 at 4. In response, we "reserve[d] ruling on Bourdaillet's motion for appointment as lead plaintiff." Finocchiaro v. NQ Mobile, Inc., No. 15 Civ. 6385 (NRB), 2017 WL 1535382, at *3 (S.D.N.Y. Apr. 17, 2017). Bourdaillet was directed to "file his motion for appointment of lead counsel no later than April 28, 2017 for the case to proceed as a potential class action." Id. After that deadline expired, plaintiffs filed a letter with this Court stating their "intent to pursue non-class action claims," and requesting an extension of time to file yet another amended complaint. ECF No. 68 (emphasis added). After receiving a seven day extension, plaintiffs filed the operative, fourth amended complaint on May 11, 2017. See ECF No. 72.

## DISCUSSION

### I.   Pleading Standards

To survive a motion to dismiss, plaintiffs' complaint must include "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). If plaintiffs have failed to "nudge[] their claims across the line from conceivable to plausible, their complaint must be

dismissed," id., a requirement that applies to "all civil actions." Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009).  In applying these standards, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." Littlejohn v. City of New York, 795 F.3d 297, 306 (2d Cir. 2015). However, "we give no effect to assertions of law or legal conclusions couched as factual allegations."  Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012) (internal quotation marks and alteration omitted).

A complaint alleging securities fraud must satisfy the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure, as well as the PSLRA.  Kleinman v. Elan Corp., plc, 706 F.3d 145, 152 (2d Cir. 2013).  More specifically, to satisfy Rule 9(b), plaintiffs "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted).  "The PSLRA expanded on the Rule 9(b) standard, requiring that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  Id.

9

(quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005)) (internal quotation marks omitted).

## II.  Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5 implements Section 10(b) by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To sustain a private cause of action under Section 10(b) and Rule 10b-5, plaintiffs must adequately plead: "(1) a material misrepresentation or omission by the  defendant;  (2)  scienter;  (3)  a  connection  between  the misrepresentation  or  omission  and  the  purchase  or  sale  of  a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232 (2d Cir. 2014) (quoting  Stoneridge  Inv.  Partners,  LLC  v.  Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)).

### a. Alleged Misrepresentation

Plaintiffs assert that defendants "misrepresented the truth about NQ, its operations, and prospects."  FAC ¶ 42.  In particular, Khan and/or Mathison allegedly told "investors," including plaintiffs Selby and Finocchiaro, "and, upon information and belief, numerous other NQ investors, in many private meetings" in August and September 2014 that NQ "was worth billions" and "that the Company would not accept a buyout offer from Bison Capital, of $9.80 per share because that offer was too low."  Id. ¶¶ 13, 43.

Plaintiffs have not adequately pleaded an actionable misrepresentation under the securities laws.  In particular, plaintiffs have not demonstrated the materiality of defendants' alleged misstatement or their justifiable reliance thereon.  We consider each deficiency in turn.

### 1.  Materiality

To be actionable under Section 10(b) and Rule 10b-5, defendants' alleged misrepresentation must be material.  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).  That is, there must be a substantial likelihood that a reasonable investor would consider the fact misstated or omitted important in connection with a contemplated securities transaction.  See Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 717 (2d Cir. 2011).  Materiality is an "inherently fact-specific finding."  Id. at 716-17 (quoting Basic, 485 U.S. at 236).  "Therefore, the determination of whether an alleged misrepresentation is material necessarily

11

depends on all relevant circumstances." ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009).

The "relevant circumstances" in this case make clear that defendants' alleged misstatement was immaterial, as it was obviously non-actionable puffery.  "[C]ourts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor would find them important to the total mix of information available."  Gavish v. Revlon, Inc., No. 00 Civ. 7291(SHS), 2004 WL 2210269, at *20 (S.D.N.Y. Sept. 30, 2004) (quoting Shaw v. Dig. Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996)); see Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000) ("statements containing simple economic projections, expressions of optimism, and other puffery are insufficient").  "The corporate puffery rule applies to loose optimism about both a company's current state of affairs and its future prospects."  In re Nokia Oyj (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) (internal quotation marks omitted); see Pollio v. MF Glob., Ltd., 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009).

Here, Khan and/or Mathison allegedly stated that NQ was "worth billions" not as an affirmative, specific representation of NQ's share or enterprise value, but in connection with their disclosure that NQ intended to reject Bison's acquisition effort. See FAC ¶ 13. Khan and/or Mathison explained that they planned to reject Bison's acquisition bid of $9.80 per share because it was too low; Bison had undervalued NQ which, Khan and/or Mathison suggested, was "worth billions." See id. ¶ 43. This was, in light of information that was publicly available to plaintiffs and which plaintiffs have recited in their own complaint, an extraordinarily optimistic view of NQ's value. NQ had issued an $89 million IPO in 2011, a $69 million secondary offering in 2012, and is "considered a small-cap stock with a total market capitalization of $479 million." FAC ¶ 2. Thus, while we do not suggest that statements concerning the value of a security or corporation are never material, see, e.g., Araujo v. John Hancock Life Ins. Co., 206 F. Supp. 2d 377, 382 (E.D.N.Y. 2002); Korinsky v. Salomon Smith Barney Inc., No. 01 Civ. 6085(SWK), 2002 WL 27775, at *4 (S.D.N.Y. Jan. 10, 2002), Khan and/or Mathison's overly optimistic suggestion of the extent to which Bison's bid undervalued NQ is precisely the type of "vague" and "rosy" affirmation of a company's current state of affairs that amounts to no more than immaterial puffery, see In re Nokia Oyj; 423 F. Supp. 2d at 397; Gavish, 2004 WL 2210269, at *20.

Further, Khan and/or Mathison's statement that NQ would decline Bison's acquisition bid, far from being a material misrepresentation, was the truth.   On October 28, 2014, NQ announced to the public that it had formally rejected Bison's acquisition attempt, validating Khan and/or Mathison's "August and September 2014" statement.[6]   See FAC ¶ 14.   "After careful consideration," NQ explained, "NQ Mobile will be best positioned to maximize the value to its shareholders as a public company. Consequently, the Board rejected the proposed privatization offer from Bison Capital Holding Company Limited . . . announced on July 30, 2014."  NQ Mobile Inc., NQ Mobile's Board Formally Rejects the Bison Capital Privatization Offer; Company Closes the Sale of a Minority Interest Investment in FL Mobile (Form 6-K) (Oct. 29, 2014).

### 2. Reliance

Even assuming, *arguendo*, plaintiffs had pleaded a material misrepresentation, their claim would still fail as they have not demonstrated justifiable reliance on that statement.

---

[6] While Selby, Finocchiaro, and "numerous other NQ investors" were not victims of a material misrepresentation, they *did* apparently receive material non-public information.   That NQ would decline Bison's acquisition offer, disclosed to them in August and September 2014, was first announced to the public in late October 2014.  See FAC ¶¶ 13-14.  In the interim, the recipients were subject to "a duty [either] to abstain from trading or to disclose the information publicly."  SEC v. Obus, 693 F.3d 276, 285 (2d Cir. 2012) (citing Chiarella v. United States, 445 U.S. 222, 227-30 (1980)).  Plaintiffs do not acknowledge that they did either.

"A showing of justifiable reliance is essential to sustain a securities fraud claim."  Abbey v. 3F Therapeutics, Inc., No. 06 CV 409 (KMW), 2011 WL 651416, at *7 (S.D.N.Y. Feb. 22, 2011) (internal quotation marks omitted), aff'd sub nom. Abbey v. Skokos, 509 F. App'x 92 (2d Cir. 2013); see Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 00 Civ. 8058 (NRB), 2004 WL 2072536, at *8 (S.D.N.Y. Sept. 14, 2004). ("Federal securities law . . . require[s] a plaintiff to demonstrate justifiable reliance upon the alleged misrepresentation that forms the basis of the plaintiff's action.").  Simply alleging that plaintiffs relied on defendants' alleged misrepresentation is insufficient; plaintiffs' reliance must have been reasonable in order for their claim to proceed.  See First Lincoln Holdings, Inc. v. Equitable Life Assurance Soc. of U.S., 43 F. App'x 462, 464 (2d Cir. 2002) (citing Harsco Corp. v. Segui, 91 F.3d 337, 342 (2d Cir. 1996)).  "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor would have discovered the truth."  Ashland Inc. v. Morgan Stanley & Co., 652 F.3d 333, 337–38 (2d Cir. 2011) (quoting Brown v. E.F. Hutton Grp., Inc., 991 F.2d 1020, 1032 (2d Cir. 1993)).

In evaluating the reasonableness of plaintiffs' reliance, courts consider a variety of factors, including:

> (1) [t]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3)

> access to the relevant information; (3) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

Id. at 338.

Here, plaintiffs have not alleged the existence of a fiduciary, longstanding, or personal relationship with Khan and/or Mathison, nor any particular efforts that were made to "conceal" NQ's purported fraud.  The alleged misrepresentation that NQ was "worth billions" is also relatively specific, and thus capable of verification.  Moreover, NQ's financial history was fully available to plaintiffs; they need not have looked any farther than NQ's publicly filed prospectus.  In re Merrill Lynch Auction Rate Sec. Litig., 704 F. Supp. 2d 378, 396 (S.D.N.Y. 2010) ("In today's world, it is unrealistic to argue that documents available on the SEC website are not readily accessible to the investing public." (internal quotation marks and alteration omitted)), aff'd sub nom. Wilson v. Merrill Lynch & Co., 671 F.3d 120 (2d Cir. 2011).  Had they done so, plaintiffs would quickly have learned that NQ was worth far less than "billions" in the closely preceding years.  See FAC ¶ 2 (NQ issued only an $89 million IPO in 2011 (three years prior), a $69 million secondary offering in 2012 (two years prior), and "is considered a small-cap stock with a total market capitalization of $479 million").  Under these

16

circumstances, relying on defendants' alleged misstatement was unreasonable.  See Gavin/Solmonese LLC v. D'Arnaud-Taylor, 68 F. Supp. 3d 530, 542-43 (S.D.N.Y. 2014) (finding reliance to be unreasonable as, *inter alia*, broker-dealer declarant had no fiduciary duty to an investor who could have "detected misstatements" by "examining contemporaneous SEC filings"), aff'd, 639 F. App'x 664 (2d Cir. 2016).

Plaintiffs, having failed to plead materiality or justifiable reliance, have not stated an actionable claim on the basis of defendants' alleged affirmative misrepresentation.

### b. Alleged Omission

Plaintiffs also allege that defendants "deliberately and secretively made numerous unmonitored acquisitions of small, private Chinese companies of little or no value, including Showself and Yipai."  FAC ¶ 43.  Plaintiffs claim that defendants "violated federal securities laws by deliberately making material omissions regarding [these] acquisitions that resulted in a 40% dilution of shares, and [by] failing to disclose these May 2014 acquisitions until five and a half months after the[y] . . . were complete."  Id.

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  Basic, 485 U.S. at 239 n.17.  The Second Circuit has "consistently held that 'an omission is actionable under the securities laws only when the corporation is subject to a duty to

17

disclose the omitted facts.'" Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)). Such a duty may arise if there is (1) a corporate insider trading on confidential information, (2) a statute or regulation requiring disclosure, or (3) a corporate statement that is otherwise inaccurate, incomplete, or misleading. Id. (citing Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992)). By contrast, "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor." Resnik v. Swartz, 303 F.3d 147, 154 (2d Cir. 2002).

Plaintiffs have, quite simply, not pleaded a duty pursuant to which NQ was obligated to disclose the Showself or Yipai acquisitions to investors earlier than it did. There is no allegation that Khan and/or Mathison engaged in insider trading. Plaintiffs also have not pointed to any statutes or regulations requiring earlier disclosure. Finally, plaintiffs have not alleged that any statement was rendered inaccurate, incomplete, or misleading because of the alleged omission. See, e.g., Vladimir v. Bioenvision Inc., 606 F. Supp. 2d 473, 489-90 (S.D.N.Y. 2009), aff'd sub nom. Thesling v. Bioenvision, Inc., 374 F. App'x 141 (2d Cir. 2010).

Indeed, not only were defendants under no obligation to disclose the Showself and Yipai acquisitions to Finocchiaro and

18

Selby in August and September 2014, they would have been violating the securities laws had they done so under the pleaded circumstances.  SEC Regulation FD provides that "[w]henever any issuer, or any person acting on its behalf, discloses any material nonpublic information regarding that issuer or its securities to any person . . . [w]ho is a holder of the issuer's securities, under circumstances in which it is reasonably foreseeable that the person will purchase or sell the issuer's securities on the basis of the information" the issuer "shall make public disclosure of that information" either "[s]imultaneously, in the case of an intentional disclosure" or "[p]romptly, in the case of a non-intentional disclosure." 17 C.F.R. § 243.100(a), (b)(1)(iv).  In other words, if a "company makes selective disclosure of material nonpublic information, it must disclose the same information publicly."  Jones v. Midland Funding, LLC, No. 3:08CV802(RNC), 2009 WL 3053724, at *1 n.1 (D. Conn. Sept. 22, 2009) (quoting CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 564 F. Supp. 511, 525 n.35 (S.D.N.Y. 2008)).  Had Khan and/or Mathison disclosed the details of NQ's recent acquisitions to some "investors" in "many private meetings," they would have been making precisely the type of selective disclosure Regulation FD proscribes.

Defendants disclosed the Showself and Yipai acquisitions, which took place in May 2014, through a public disclosure in their next annual filing in October 2014, i.e., the Fiscal Year 2013

19

Form 20-F. And while plaintiffs protest that Form 20-F was belatedly filed, they have failed to identify any earlier reports in which these acquisitions should have been, but were not, disclosed. Instead, the immediately preceding Form 20-F, filed on April 19, 2013, disclosed the precise risks about which plaintiffs now complain—that acquiring corporations by issuing ADSs could result in share dilution. "We have pursued and may continue to pursue acquisitions . . . which may be unsuccessful or may expose us to additional risk." Musoff Decl. Ex. B, at 7. "We plan to grow both organically and through acquisitions." Id. "The trading price of our ADSs may continue to be volatile and subject to wide fluctuations in response to factors including the following: . . . acquisitions." Id. at 32. "[I]f we pay for our future acquisitions in whole or in part with additionally issued . . . ADSs, [shareholders'] ownership interests in our company would be diluted and this, in turn, could have a material adverse effect on the price of our ADSs." Id. at 33. Plaintiffs were warned of the potential consequences of NQ's growth-by-acquisitions strategy. That the strategy proved unsuccessful does not make for a valid securities fraud claim.

In sum, plaintiffs have not alleged an actionable omission with regard to the acquisitions of Showself and Yipai.[7]

---

[7] At times, the FAC reads as if plaintiffs are challenging defendants' wisdom in engaging in the particular acquisitions themselves. See, e.g., FAC ¶ 9 ("In sum, NQ Mobile spent around $13 million in cash and 137 million common

Plaintiffs' claims against NQ under Section 10(b) and Rule 10b-5, therefore, are dismissed in their entirety.

### III. Section 20(a) of the Exchange Act

Section 20(a) establishes a cause of action against "[e]very person who, directly or indirectly, controls any person" or entity that violates the Exchange Act.  15 U.S.C. § 78t(a).  "In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). Because plaintiffs have failed to state a primary violation of Section 10(b) or Rule 10b-5 by NQ, plaintiffs' claims against Khan and Mathison under Section 20(a) must likewise be dismissed.  See, e.g., Rombach v. Chang, 355 F.3d 164, 177-78 (2d Cir. 2004).

### IV. Leave to Amend

Finally, plaintiffs seek leave to amend the FAC to cure any potential deficiencies, see Pls.' Opp'n at 7-8, attaching a copy of what would be their fifth amended complaint, see Declaration of Bridget Butler Ex. A.

Although Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend shall be "freely give[n] . . . when justice so

---

shares to acquire stakes in several private Chinese companies, in 2014, including, but not limited to, Showself and Yipai."). Such allegations do not state a claim for securities fraud.  See Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000)("[P]oor business judgment is not actionable under [S]ection 10(b) and Rule 10b-5."); City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC, 423 F. Supp. 2d 348, 356 (S.D.N.Y. 2006) (same).

21

requires," the decision is "within the sound discretion of the district court."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007).  "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  Id.

Plaintiffs have already had more than an adequate opportunity to plead an actionable complaint of securities fraud.  Not only was the fourth amended complaint filed almost two years after plaintiffs initiated this action, it was also preceded by pre-motion letters in which defendants raised most of the arguments we have addressed here.  See Shapiro v. Goldman, No. 14 Civ. 10119 (NRB), 2016 WL 4371741, at *23 (S.D.N.Y. Aug. 15, 2016) ("In this context, permitting plaintiff a fourth opportunity to plead his claims would needlessly burden counsel and the Court, and unhelpfully encourage counsel in future cases to forego earlier opportunities to replead once on notice of the full arguments favoring dismissal." (internal quotation marks omitted)), aff'd, 696 F. App'x 532 (2d Cir. 2017); Lopez v. Ctpartners Exec. Search Inc., 173 F. Supp. 3d 12, 44 (S.D.N.Y. 2016).  Simply put, "[f]our bites at the apple are more than sufficient."  Weinstein v. Appelbaum, 193 F. Supp. 2d 774, 782 (S.D.N.Y. 2002); see De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 72 (2d Cir. 1996) (upholding district court's denial of plaintiff's fifth attempt to amend his complaint because he had been given "ample prior opportunity to

22

allege a claim"); In re GPC Biotech AG Sec. Litig., No. 07 Civ. 06728(DC), 2009 WL 5125130, at *5 (S.D.N.Y. Dec. 29, 2009) (denying leave to amend after more than two years, citing "inordinate length of delay" and "expenditure of time and resources").

Moreover, upon reviewing the proposed fifth amended complaint, it is clear that the few fresh allegations do not cure the substantive and substantial deficiencies we have identified in the fourth amended complaint, supra. See Williams v. Citigroup Inc., 659 F.3d 208, 214 (2d Cir. 2014) (holding that leave to amend need not be granted where the proposed amendment would be futile).

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiffs' fourth amended complaint with prejudice is granted. The Clerk of the Court is respectfully directed to enter judgment for defendants and to close this case.

Dated:     New York, New York
           February 27, 2018

           NAOMI REICE BUCHWALD
           UNITED STATES DISTRICT JUDGE

23